Opinion by Judge B. FLETCHER; Concurrence by Judge FISHER; Dissent by Judge MURGUIA.
OPINION
B. FLETCHER, Circuit Judge,
with whom SCHROEDER, WARDLAW, FISHER, PAEZ, and M. SMITH, Circuit Judges, join in full:
Tio Sessoms, a nineteen-year-old black man, sat alone in an eight-by-ten foot interrogation room. Five days earlier, on the advice of his father, Sessoms had turned himself in to the local police. Before doing so, Sessoms’s father told his son: you must ask for a lawyer before talking to the police.
Sessoms followed his father’s advice. When the two police officers entered the interrogation room, Sessoms sat slouched in his chair. He looked up and they exchanged brief pleasantries. Forty seconds after the officers entered the room and before they read Sessoms his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the following exchange occurred:
Sessoms: There wouldn’t be any possible way that I could have a — a lawyer present while we do this?
[Detective]: Well, uh, what I’ll do is, urn—
Sessoms: Yeah, that’s what my dad asked me to ask you guys ... uh, give me a lawyer.[1]
*1056 Instead of immediately ceasing the interrogation, the officers persevered and convinced Sessoms that the only way to tell his side of the story was to speak to them without an attorney. Eventually, Sessoms agreed to talk and made incriminating statements.
We hold that the California Court of Appeal unreasonably applied clearly established Supreme Court precedent when it concluded that Sessoms was required under Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), to unambiguously invoke his right to counsel. We reverse the district court’s judgment and remand with directions to grant a conditional writ of habeas corpus.
I. Facts and Procedural History
On October 20, 1999, Sessoms and two others burglarized Edward Sheriffs home. During the burglary, one of Sessoms’s accomplices choked and repeatedly stabbed Sheriff.
Sessoms then fled from California to Oklahoma. There, at his father’s urging, Sessoms surrendered to Oklahoma police on November 15,1999. His father advised him to ask for a lawyer before talking to the police. Sessoms was in custody for four days before being interrogated. On November 19 or 20, two police officers, Detectives Woods and Keller, flew from California to Oklahoma to question Sessoms at the county jail where he was being held.
The entire interrogation was videotaped. The video shows Sessoms sitting alone, talking to himself and quietly saying, “I’m not a criminal, but I got [inaudible]. They didn’t tell me if I have a lawyer. I know I want to talk to a lawyer.”[2] When the detectives entered the room, the following exchange took place:
Det. Woods: ... Tio, I’m Dick.
Sessoms: How you doing, all right. You already know me.
Det. Woods: You say ...
Det. Keller: Tio, Pat Keller.
Det. Woods: You say Tio or Theo? Sessoms: It — my name is pronounced Tio because it’s Spanish.
Det. Woods: Tio. Okay.
Det. Keller: Why don’t we swap corners here for a minute, you guys? Go ahead and sit here.
Sessoms: So glad you fellows had a safe flight.
Det. Woods: Huh?
Sessoms: I’m glad you fellows had a safe flight out here.
Det. Keller: So are we. Huh.
Det. Woods: Well, we want a safe one back too.
Sessoms: Oh, you know [inaudible].
Det. Woods: Yeah. Uh, we both, uh- — ■ both from, uh, Sacramento PD and, uh—
Sessoms: There wouldn’t be any possible way that I could have a — a lawyer present while we do this?
Det. Woods: Well, uh, what I’ll do is, um—
Sessoms: Yeah, that’s what my dad asked me to ask you guys ... uh, give me a lawyer.
Woods proceeded as though Sessoms said nothing. Instead of ending the interrogation, Woods persuaded Sessoms that having a lawyer was a bad idea. Sessoms explained that he was concerned that some *1057 police officers “end up switching your words afterwards,” to which Woods responded that he had no intention of playing any “switch games” and would even tape record the conversation to allay Sessoms’s fears. Woods then explained the situation: Sessoms and his two accomplices were all being “charged with the same thing.” Woods said he already knew “what happened” because Sessoms’s accomplices had waived their rights “and laid it out from A to Z.” Woods reassured Sessoms that he believed that Sessoms “did not participate in the stabbing,” but warned that if Sessoms didn’t make a statement right then and there, Woods wasn’t going to be able to “get his version of it” because “most all attorneys — in fact, all attorneys — will sometimes or usually advise you not to make a statement.” He then said he didn’t really “need [Sessoms’s] statement to make [the] case” anyway because he “already [had] two and a half other complete statements,” reiterating that he already “[knew] what happened.”
Only then — after telling Sessoms that having a lawyer would only hurt him, and that invoking his right to counsel would be futile because the police already knew what happened — did the police even read Sessoms his rights under Miranda. Sessoms eventually said “Let’s talk,” and proceeded to implicate himself in the crime.
Prior to trial, Sessoms moved to suppress the incriminating statements, arguing that he had clearly invoked his right to counsel. The trial court denied the motion. Sessoms went to trial and was convicted of murder, robbery, and burglary, with the special circumstance that he was engaged in the commission or attempted commission of the crimes of robbery and burglary when the murder occurred. He was sentenced to life in prison without the possibility of parole.
Sessoms appealed to the California Court of Appeal. That court analyzed Sessoms’s statements under the rule of Davis: a request for counsel must be unequivocal or unambiguous. The state court then determined that Sessoms’s statements did not satisfy Davis’s requirement. It found that “although [Sessoms] twice explicitly referred to an attorney, neither statement was an unequivocal or unambiguous request for counsel.” People v. Sessoms, No. C041139, 2004 WL 49720, at *3 (Cal. Ct.App. Jan. 12, 2004). According to the state court, Sessoms’s first statement was “legally indistinguishable” from the statements made in Davis, 512 U.S. at 455, 114 S.Ct. 2350 (“Maybe I should talk to a lawyer”) and People v. Crittenden, 9 Cal.4th 83, 123-24, 36 Cal.Rptr.2d 474, 885 P.2d 887 (1994) (“Did you say I could have a lawyer?”), which were not unequivocal requests for an attorney. Sessoms, 2004 WL 49720, at *3. Sessoms’s second statement, the state court continued, was also not an unequivocal request for an attorney, but rather “[a]t best ... a statement of his father’s advice to him.” Id. Ultimately, the California Court of Appeal concluded that Sessoms’s statements were equivocal and not “ ‘sufficiently clear[ ] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.’ ” Id. (citing Davis, 512 U.S. at 459, 114 S.Ct. 2350).
Sessoms then filed a federal habeas petition. The district court denied the petition but granted a certificate of appealability on his Miranda claim and his ineffective assistance of counsel claim. A divided three-judge panel upheld the district court’s denial of Sessoms’s habeas petition. The panel majority recognized that “[b]e-cause Sessoms’s statements were made prior to his Miranda waiver, Davis cannot apply as ‘clearly established Federal law1 in this case.” Sessoms v. Runnels, 650 F.3d 1276, 1283 (9th Cir.2011). But the *1058 panel majority held that it was not unreasonable for the state court to require an unambiguous request for counsel and concluded that Sessoms’s request was ambiguous. Id. We granted rehearing en banc. We now conclude that the state court’s decision was an unreasonable application of clearly established federal law. We therefore reverse the district court’s denial of habeas relief.[3]
II. Standard of Review
We review de novo the district court’s denial of a petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. Robinson v. Schriro, 595 F.3d 1086, 1099 (9th Cir.2010). Because Sessoms’s habeas petition was filed after April 24, 1996, we apply AEDPA. Under AEDPA, Sessoms is entitled to federal habeas relief if he can show that the state court’s adjudication of the merits of his claim was “contrary to” then — established Supreme Court precedent; was “an unreasonable application of’ such law; or “was based on an unreasonable determination of the facts” in light of the state court record. 28 U.S.C. § 2254(d); Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011).
A state court decision is “contrary to” clearly established Supreme Court precedent if it (1) “applies a rule that contradicts the governing law set forth in [the Supreme Court’s] cases”; or (2) reaches a different result on a “materially indistinguishable” set of facts. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state-court decision involves an “unreasonable application” of clearly established federal law if the state court (1) “identifies the correct governing legal rule from [the Supreme] Court’s cases but unreasonably applies it to the facts of the ... case”; or (2) “unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.” Id. at 407, 120 S.Ct. 1495.
This case illustrates the difficulty in defining the precise contours of the “contrary to” and “unreasonable application” prongs of § 2254(d)(1). Indeed, Williams itself recognized that in many eases it will be “difficult to distinguish a decision involving an unreasonable extension of a legal principle,” warranting relief under the “unreasonable application” clause “from a decision that arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law,” warranting relief under the “contrary to” clause. Id. at 408, 120 S.Ct. 1495 (internal quotation marks omitted). Deciding whether this case falls into the unreasonable extension of legal principle or incorrect choice of law category involves, as the Supreme Court in Williams described, some “problems of precision.” Id. Regardless, “it is clear that both [standards] are met when the state court has failed to follow the law as set forth by the Supreme Court.” Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir.2000). The state court decision is both contrary to and involves an unreasonable application of Supreme Court precedent because it unreasonably extended the principle from Davis to a new context where it should not apply and because it analyzed Sessoms’s case using the incorrect legal framework.
III. Discussion
We begin by identifying the Supreme Court’s applicable legal principles. The landmark case of Miranda v. Arizona established certain safeguards that must be *1059 afforded to a suspect in custody, including the right to have counsel present during a custodial interrogation. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court has refined its analysis of the Miranda right to counsel in a series of cases including, as relevant here, Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
A.
In Miranda, the Supreme Court established rules the police must follow to ensure certain “basic” and “precious” rights “enshrined in our Constitution.” 384 U.S. at 442, 86 S.Ct. 1602. These rights include the Fifth Amendment’s guarantee that “No person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const, amend. V. One of the Miranda Court’s primary concerns was the temptation for law enforcement, operating with little or no supervision of their investigative actions, to overbear a defendant in an isolated interrogation setting. 384 U.S. at 461, 86 S.Ct. 1602. The Fifth Amendment privilege, explained the Court, “protect[s] persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.” Id. at 467, 86 S.Ct. 1602.
Miranda recognized that overzealous police practices during a custodial interrogation create the potential for compulsion in violation of the Fifth Amendment. Id. at 455-58, 86 S.Ct. 1602. Indeed, some of the tactics of which Miranda warns were employed by the interrogators in this case. After Sessoms asked for an attorney, Woods persisted in his questioning. He told Sessoms he already knew what happened, and that Sessoms’s accomplices had already confessed and laid it out from A to Z, thereby “displaying] an air of confidence in [Sessoms’s] guilt” and appearing only to be “interest[ed] in confirming certain details.” Id. at 450, 86 S.Ct. 1602. Woods offered Sessoms a “legal excuse[ ]” and assured him that he knew Sessoms did not participate in the stabbing. See id. at 451-52, 86 S.Ct. 1602. But then Woods immediately reversed course, telling Sessoms that he didn’t really need his statement to make the case anyway, because Sessoms’s accomplices had already talked, thereby placing Sessoms “in a psychological state where his story [was] but an elaboration of what the police purported] to know already — that he [was] guilty.” Id. at 450, 86 S.Ct. 1602. Eventually, the officers, much like Miranda warns, overwhelmed Sessoms and persuaded him “out of exercising his constitutional rights.” Id. at 455, 86 S.Ct. 1602.
In order to assure that the use of such psychological tactics to exploit a suspect’s vulnerabilities did not run afoul of the Fifth Amendment, Miranda set forth clear mandates: “[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney.” Id. at 444, 86 S.Ct. 1602. If a suspect “indicates in any manner and at any stage of the process that he wishes to consult with an attorney,” all questioning must cease.[4] Id. at 444-45, 86 S.Ct. 1602. These protective devices are necessary to dispel the inherent compulsion of custodial interrogations and “to insure that what was proclaimed in the Constitution had not become but a *1060 form of words in the hands of government officials.” Id. at 444, 86 S.Ct. 1602 (internal citation and quotation marks omitted).
Fifteen years later, in Edwards v. Arizona, the Supreme Court reaffirmed the view that the “assertion of the right to counsel was a significant event and that once exercised by the accused, ‘the interrogation must cease until an attorney is present.’ ” Edwards, 451 U.S. at 485, 101 S.Ct. 1880 (quoting Miranda, 384 U.S. at 474, 86 S.Ct. 1602). In Edwards, the suspect was arrested and taken to the police station. Id. at 478, 101 S.Ct. 1880. He requested counsel, at which point all questioning ceased. Id. at 479, 101 S.Ct. 1880. The next day, the police visited Edwards in jail, but he told the jail guard that he did not want to talk to anyone. Id. The guard told Edwards that “he had to” talk to the police, and Edwards eventually confessed. Id. The Supreme Court held that Edwards’s Fifth Amendment rights were violated and “reconfirm[ed]” that a suspect, “having expressed his desire to deal with the police only through counsel,”[5] must not be “subject to further interrogation by the authorities until counsel has been made available to him.” Id. at 484-85, 101 S.Ct. 1880. The purpose of the Edwards rule is “to prevent police from badgering a defendant into waiving his previously asserted Miranda rights,” Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), and to ensure that police “will not take advantage of the mounting coercive pressures of prolonged police custody,” Maryland v. Shatter, — U.S. -, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) (internal citations and quotation marks omitted).
The Supreme Court revisited the scope of Miranda and Edwards in Davis v. United States. There, the Court confronted a scenario where Davis had executed a written waiver of his rights and expressly agreed to speak to the police. 512 U.S. at 454-55, 114 S.Ct. 2350. Only after being questioned for ninety minutes did Davis utter the words “[m]aybe I should talk to a lawyer.” Id. at 455, 114 S.Ct. 2350. In deciding the case, the Supreme Court again reaffirmed the fundamental principle that “if a suspect requests counsel at any time during [a custodial] interview, he is not [to be] subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.” Id. at 458, 114 S.Ct. 2350 (citing Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880).
The Court went on to clarify, however, that “if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.” Id. at 459, 114 S.Ct. 2350. “Rather, the suspect must unambiguously request counsel.” Id[6]
*1061 The Court explained the reasoning behind this requirement as follows:
A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards provides an additional protection — if a suspect subsequently requests an attorney, questioning must cease — it is one that must be affirmatively invoked by the suspect.
Id. at 460-61, 114 S.Ct. 2350. The Court ultimately concluded that the statement “[mjaybe I should talk to a lawyer” was not an unambiguous or unequivocal request for counsel. Id. at 462, 114 S.Ct. 2350.
But Davis clearly limits its holding to statements made after a suspect has waived his Miranda rights: “We therefore hold that, after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.”[7] Id. at 461, 114 S.Ct. 2350 (emphasis added); see also United States v. Rodriguez, 518 F.3d 1072, 1079 (9th Cir.2008) (“Davis addressed what the suspect must do to restore his Miranda rights after having already knowingly and voluntarily waived them.”); 2 Wayne R. La-Fave, et al., Criminal Procedure § 6.9(g), n. 185 (3d ed. 2007 & Supp.2012) (“Davis is ... limited [to the post-waiver context].” (internal citations omitted)). When there has not been a knowing and voluntary waiver, “[ijnvocation of the Miranda right to counsel ‘requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,’ ” Davis, 512 U.S. at 459, 114 S.Ct. 2350 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)), but the assertion need not be “unambiguous or unequivocal,” id. at 462, 114 S.Ct. 2350. Thus, where the suspect has not waived his rights, Davis’s rule is inapplicable. We therefore agree with Sessoms that the California Court of Appeal unreasonably extended Davis to requests for counsel that, like his, were made before a valid waiver of Miranda rights. See Williams, 529 U.S. at 407, 120 S.Ct. 1495.
The state argues, however, that the Supreme Court’s recent decision in Berghuis v. Thompkins suggests that Davis applies to all requests for counsel, whether pre- or post-waiver. — U.S. -, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). After being informed of his Miranda rights, the suspect in Berghuis refused to sign a waiver form and simply remained silent through almost three hours of interrogation before making an incriminating statement. See id. at 2255-27. The Supreme Court concluded that the suspect never invoked his right to silence. Id. at 2260. Relying on Davis, the Court held that an invocation of the right to remain silent, like the right to counsel, must be unambiguous. Id. In reaching that decision, the Court provided this description of its holding in Davis:
In the context of invoking the Miranda right to counsel, the Court in Davis v. United States held that a suspect must do so “unambiguously.” If an accused makes a statement concerning the right to counsel “that is ambiguous or equivocal” or makes no statement, the police *1062 are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights.
Id. at 2259-60 (internal citations omitted). As the state points out, this description of Davis draws no distinction between ambiguous statements made before or after Miranda rights were waived.
Nonetheless, a critical factual distinction between Sessoms’s statements and those evaluated by the Court in both Davis and Berghuis remains: Sessoms made his statements before he was informed of his rights under Miranda. The Miranda Court held that the coercive atmosphere of interrogation makes it essential for a suspect to be “given a full and effective warning of his rights at the outset of the interrogation process.” 384 U.S. at 445, 86 S.Ct. 1602. As the Court stressed, when “the police [have] not advised the defendant of his constitutional privilege ... at the outset of the interrogation,” the suspect’s “abdication of [that] constitutional privilege — the choice on his part to speak to the police — [is] not made knowingly or competently because of the failure to apprise him of his rights.” Id. at 465, 86 S.Ct. 1602 (citing Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)).
Both Davis and Berghuis recognize that the suspect must be given Miranda warnings before any interrogation. In Berghuis, the Court wrote that it need not “add marginally” to Miranda’s prophylactic protections by “[t]reating an ambiguous ... statement as an invocation of Miranda rights,” because “full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.” 130 S.Ct. at 2260. Similarly, in Davis, the court emphasized that the “primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves” and that, “after having [those] right[s] explained to him,” a suspect must invoke his rights “affirmatively.” 512 U.S. at 460-61, 114 S.Ct. 2350 (emphasis added).
In light of these instructions from the Supreme Court, it is clear that Berghuis does not alter Davis’s requirement that an unambiguous invocation can apply only after a suspect has been informed of his Miranda rights. Not only are the Supreme Court cases on this point pellucid, their rationale makes eminent sense. A person not aware of his rights cannot be expected to clearly invoke them. Once, however, a suspect has been read his Miranda rights, it is reasonable to ascribe to him knowledge of those rights. If at some later point during the custodial interrogation he decides that he wants an attorney, he should be held to a higher standard of clarity to invoke that right. That is precisely what Davis concluded. Thus, if a suspect invokes his rights before the Miranda warnings are given, the invocation must be analyzed under the rule of Miranda and Edwards, not that of Davis. We therefore conclude that the California Court of Appeal unreasonably extended Davis’s clear invocation rule to a situation where it does not apply. Sessoms requested an attorney before receiving a clear and complete statement of his rights and, therefore, knowledge of his rights cannot be ascribed to him. In this circumstance, the clear invocation rule simply should not have been applied.
Because the California Court of Appeal unreasonably applied clearly established Supreme Court precedent, AEDPA’s restrictions do not apply. Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (stating that when “the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the *1063 deference AEDPA otherwise requires”); Frantz v. Hazey, 533 F.3d 724, 736-37 (9th Cir.2008) (en banc) (“where the analysis on federal habeas ... results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo”). Therefore, using the correct legal framework we consider de novo whether Sessoms invoked his right to counsel. Under Miranda and Edwards, Sessoms could “indicate!] in any manner and at any stage of the process that he wishefd] to consult with an attorney,” Miranda, 384 U.S. at 444-45, 86 S.Ct. 1602, so long as he “expressed his desire to deal with the police only through counsel,” Edwards, 451 U.S. at 484, 101 S.Ct. 1880; see also McNeil, 501 U.S. at 178, 111 S.Ct. 2204 (“It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.”). Sessoms’s statements easily meet this standard.
B.
Police officers spend their days interacting with ordinary people in our cities and neighborhoods and are surely well acquainted with how ordinary people speak. Recognizing this, the Supreme Court has directed that a defendant’s words should be “understood as ordinary people would understand them.” Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).
Here, any reasonable police officer (as indeed did these officers) would understand that Sessoms expressed his desire to have a lawyer present at his interrogation. Forty seconds into the conversation, before any meaningful exchange took place, Sessoms requested counsel twice in rapid succession. First, Sessoms said “There wouldn’t be any possible way that I could have a- — -a lawyer present while we do this?” Although it was couched in a polite and diffident manner, the meaning of Sessoms’s request was clear: he wanted a lawyer then and there.
If there were any doubt (which there should not have been), Sessoms immediately made a second statement: “Yeah, that’s what my dad asked me to ask you guys ... uh, give me a lawyer.” Simply put, the words “give me a lawyer” mean just that: “give me a lawyer.”
Each of Sessoms’s statements, taken on its own, clearly expresses his desire for an attorney. But when the two statements are taken together, that conclusion is indisputable.[8]
Of course, the best test of how a reasonable police officer would understand Sessoms’s request is how the actual police officer in this case responded. That reaction is telling. Detective Woods’s response to Sessoms’s statements — informing Sessoms that a lawyer would only prevent him from giving his side of the story and that, in any event, invocation was futile because the police already knew what happened — shows that he knew Sessoms was requesting a lawyer, and he wanted to do his best to talk Sessoms out of it. This desire is understandable. Detective Woods had flown halfway across the country to speak to Sessoms about a murder case, and it was surely frustrating when Sessoms requested a lawyer only forty seconds into the interrogation. But the “rigid prophylactic rule of Edwards ” requires the police to cease questioning immediately when a suspect requests counsel and forbids any attempt to badger a suspect into waiving his previously as *1064 serted rights. Davis, 512 U.S. at 458, 114 S.Ct. 2350 (internal quotation marks omitted); Harvey, 494 U.S. at 350, 110 S.Ct. 1176.
The California Court of Appeal’s decision could only be defended by “disregard[ing] ... the ordinary meaning” of Sessoms’s statements. Barrett, 479 U.S. at 530, 107 S.Ct. 828. This is forbidden by clearly established federal law. All that is required is some expression of a desire for the assistance of an attorney and Sessoms made his wishes sufficiently clear.
IV. CONCLUSION
Davis’s requirement that a request for counsel be unambiguous does not apply to this case. The state court acted unreasonably by requiring Sessoms to unequivocally or unambiguously invoke his right to counsel. Under Miranda and Edwards, Sessoms invoked his right to counsel. Law enforcement — those responsible for enforcing the rule of law — may not disregard the constitutional safeguards imposed by Miranda, which ensure the protection of the Fifth Amendment’s right against self-incrimination.
Upon hearing Sessoms’s request for an attorney, Detectives Woods and Keller were required to immediately terminate all questioning. See Miranda, 384 U.S. at 444-45, 86 S.Ct. 1602. They failed to do so. Therefore, Sessoms’s incriminating statements were obtained in violation of Miranda and their admission at Sessoms’s trial violated his clearly established rights under the Fifth and Fourteenth Amendments. See Edwards, 451 U.S. at 486-87, 101 S.Ct. 1880.
We reverse the district court’s denial of habeas relief and remand with instructions to grant a conditional writ of habeas corpus with directions that the state retry Sessoms within a reasonable period, or release him.
REVERSED and REMANDED.

. The transcript of the colloquy says "Give me a lawyer,” but Detective Woods, after com *1056 paring the transcript to the videotape, testified that Sessoms said "Get me a lawyer." We find this distinction irrelevant to our analysis.

. Sessoms’s statements to himself were made prior to the detectives entering the room and there is no evidence that any law enforcement officers heard these statements.

. Because we conclude that Sessoms is entitled to relief on his Miranda claim, we need not address his ineffective assistance of counsel claim.

. The dissent cites this same passage, but then curiously, states that Miranda says nothing about what the police must do when a suspect’s invocation is ambiguous. But Miranda explicitly addresses this issue — a suspect can request an attorney "in any manner." 384 U.S. at 444-45, 86 S.Ct. 1602 (emphasis added).

. The dissent correctly states that under AED-PA, the holdings and not the dicta constitutes clearly established federal law. Dissent at 1064-65. But then the dissent goes on to rely on dicta from Edwards to support its conclusion that even Edwards requires a suspect to "clearly” assert his rights to counsel. Dissent at 1066-67. Just as with the holding in Davis, see infra n. 5 and accompanying text, what is the holding in Edwards is unmistakable: "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” 451 U.S. at 484, 101 S.Ct. 1880. The Edwards's Court reference to the requirement that a suspect's invocation be "clear” is dicta and cannot be relied upon.

. The dissent accuses us of misinterpreting Davis by "selectively lififing]” language to support the majority’s view. In light of the facts of the case (after being Mirandized and *1061 talking to the police for more than an hour, Davis made an unambiguous invocation) and Davis's crystal clear holding (requiring an unambiguous invocation "after a knowing and voluntary waiver of the Miranda rights,”), the only logical interpretation of the passage quoted by the dissent is that an unambiguous statement is required after waiver.

. We rely on the Supreme Court's holdings and we cannot imagine a more clear holding than the one made here.

. Both the state court and the dissent analyze Sessoms's statements in isolation but do not consider the meaning of the two statements together.