Filed 9/12/13  P. v. Lockhart CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055125 |
| v. | (Super.Ct.No. RIF10000746) |
| RICHARD ANTHONY LOCKHART, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan, Judge.  Affirmed with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Scott Bail met defendant Richard Anthony Lockhart at a bus stop and invited defendant to the apartment shared by Bail and his roommate John Jakway.  During the

1

night, Jakway was stabbed and Scott Bail was struck in the face as he entered the bedroom in response to Jakway's cries for help. Defendant was convicted by a jury of second degree murder of John Jakway and misdemeanor battery of Scott Bail. He admitted a prior conviction alleged under the Strikes law, and was sentenced to a term of 30 years to life for the second degree murder, and a current term of six months for the battery. Defendant appealed.

On appeal, defendant claims the court erred in (1) admitting his pretrial statement to investigating detectives on the grounds he had invoked his right to counsel prior to being admonished of his *Miranda* rights,[1] and (2) denying his motion for mistrial on the ground of prosecutorial misconduct for distributing a transcript of defendant's taped interview which included information about defendant's probation and parole status. We affirm with directions to amend the abstract of judgment.

## BACKGROUND

In January 2010, Scott Bail and John Jakway shared an apartment on Iowa Street in Riverside. The two had lived together for approximately one year, but had been good friends for seven years. On the evening of January 30, 2010, after drinking for a time, Bail and Jakway left the apartment by bus to retrieve some belongings of Bail's that he had left at a sober living home. Jakway left to return to their apartment before Bail had collected all his clothes.

---

[1] Referring to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

2

After collecting his belongings, Bail went to the bus station to catch the bus to return to the apartment. At the bus station, Bail met defendant who introduced himself as "Brian." Bail believed defendant was homeless and invited defendant to come to the apartment where he could eat, drink and shower. Bail had brought "strays" home on prior occasions to help people out.

Bail and defendant took the bus to the apartment Bail shared with Jakway, upsetting Jakway. Jakway yelled and told defendant to leave several times, but Bail blew it off and ignored Jakway. For most of the evening, Bail and defendant drank in the living room, while Jakway stayed in the bedroom. At one point, defendant went into the kitchen and offered to wash dishes. Defendant and Bail drank vodka till they ran out, and defendant went to the store to purchase more alcohol.

At another point, Jakway went into the bathroom, which was located within the bedroom of the apartment, to be left alone. Bail and defendant tried to calm him down and talk him into allowing defendant to stay the night. Defendant, who had been informed earlier that Jakway was homosexual, offered to give Jakway a blow job, but Jakway told him to go away. Bail pointed out to Jakway that it was cold outside, so Jakway agreed defendant could stay until 6:00 a.m. the next morning. Jakway stayed in the bedroom the entire time defendant was there.

Sometime thereafter, while Bail was sitting on the living room couch, defendant walked past him and entered the bedroom; Bail assumed he had to use the bathroom. However, a few seconds later, Bail heard Jakway scream for help, and a hitting sound, so he ran into the bedroom. As soon as Bail crossed the threshold, he was struck in the face

3

and head, and fell to the floor, possibly losing consciousness. When Bail picked himself up, he was bleeding and disoriented. He saw Jakway on the bed, motionless. Defendant told him that Jakway was just sleeping and that he would be all right in the morning.

Defendant calmly and casually pulled a sheet or other covering over Jakway. Bail was frightened and covered with blood from his facial injuries. Defendant took Bail into the bathroom, took Bail's shirt off, and started wiping the blood from Bail, using some spray cleaner to wipe the blood off. Then defendant took Bail's shirt outside to one of the dumpsters. While defendant was outside, Bail tried to call 911, but defendant returned so he hung up. Bail told defendant he had to call the police and do something with the body, so defendant left. After he had gone, Bail found a knife in the kitchen sink. It seemed out of place, so Bail set it on a towel. Then Bail called to report the murder.

Riverside Police Department Lt. Bartholomew responded to the 911 call. When she arrived at the apartment, Bail came out, upset and agitated, and asked for help for his friend. In the bedroom, they found an adult male lying on the bed, motionless, and covered with blood on his upper chest and left side.

Officer Tedesco also responded to the 911 call, and was advised that a transient male wearing a white shirt had left the scene. As she drove to the location, she saw a person who matched the description. The person was the defendant, whom she stopped. The officer saw some blood spatter on the shirt, but the bottom of the shirt was tucked in. The officer asked defendant to pull out his shirt tail, and when one of the backup officers pulled it out, she saw more blood on the bottom of the shirt. Defendant informed the

4

officer that he was coming from the trolley, but the officer was aware that the trolley did not run at that hour (1:30 a.m.).

At the crime scene, investigating officers found knives and collected them. Inside the dumpster, investigators found a shirt and collected it. Laboratory testing of the knives revealed the presence of blood on one of them. Swabs of the blood on the knife, as well as cuttings of the bloodstains found on Bail's and defendant's shirts, were sent to a laboratory for DNA testing along with reference samples from Jakway, Bail and defendant.

Testing of the cuttings from the bottom of defendant's shirt showed blood from three sources, with Jakway being the major contributor. The stains on the bottom of that shirt were of three types: spatter, transfer stains, and watery stains. Bail's blood was also found on a cutting from another location on defendant's shirt. The blood stains from Bail's shirt were from a single source, Bail. The swabs from the knife handle had possible major contributors that included both Jakway and Bail.

The autopsy revealed Jakway had died of two knife wounds, inflicted on the left side of the body, near the armpit area. Both wounds penetrated from left to right, and from back to front. Both wounds damaged the inside of the left lung. The second wound also damaged the sack around the heart and punctured the heart. Jakway also suffered a rib fracture and there were defensive wounds on his hands.

At the police station, defendant was interviewed by homicide detectives several hours later.[2] The defendant denied stabbing Jakway but he acknowledged fighting with Bail. Defendant also admitted he went into the bedroom to talk to Jakway, and that he sat on Jakway's legs on the bed. Defendant stated he did not know where the knife came from, but that Jakway "went to hand it back over to . . . somewhere else," made a "small move." Defendant reported that Jakway jumped up and was pierced by the knife accidentally, stabbing himself.

Defendant was charged with the murder of Jakway (Pen. Code, § 187, subd. (a), count 1) and battery with serious bodily injury of Bail. (Pen. Code, § 243, subd. (d), count 2.) It was further alleged he had previously been convicted of a serious or violent felony within the meaning of the Strikes law. (Pen. Code, § 667, subds. (c), (e)(1); Pen. Code, § 1170.12, subd, (c)(1).) Following a jury trial, defendant was convicted of second degree murder as to count 1, and misdemeanor battery (Pen. Code, § 242) as to count 2. At sentencing, defendant admitted the Strike allegation. He was sentenced to 15 years to life for the second degree murder, which was doubled under the Strikes law for a term of 30 years to life. Defendant was also sentenced to a concurrent term of 180 days for the battery count.

Defendant timely appealed.

---

[2] Additional facts relating to the circumstances of the interview will be discussed, *infra.*

DISCUSSION

## 1. *Defendant's Fifth Amendment Claim*

During in limine proceedings, defendant sought a ruling excluding his pretrial statements on the grounds he (a) was not properly advised of his *Miranda* rights prior to the interrogation, and (b) unequivocally invoked his right to counsel prior to making incriminating statements. The court ruled that the defendant's indication that "[i]f I'm gonna be charged with something or something like that, like, regardless, I'm gonna go ahead and um, I'll just, I'll wait 'til I can talk to my [attorney]"[3] was ambiguous and equivocal, authorizing the detectives to further inquire.

Defendant argues that the court erred in ruling defendant's statements admissible. We disagree.

### a. *Standard of Review*

The scope of our review is well established: we must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. (*People v. Boyette* (2002) 29 Cal.4th 381, 412; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) Once the facts have been determined, we review the decision to admit the statements under the de novo standard of review, where we independently determine whether the statements were lawfully admitted into evidence. (*People v. Weaver* (2001) 26 Cal.4th 876, 918.)

---

[3] The transcript of the recording reviewed during in limine motions indicates defendant would wait until he could "talk to my *children*." This was corrected subsequently. We have watched the DVD of defendant's interview; defendant did not mention children.

7

*b.* *Analysis*

The Fifth Amendment to the United States Constitution provides in part that "'no person "shall be compelled in any criminal case to be a witness against himself.""'" This protection applies to the states under the Fourteenth Amendment's due process clause. (*Malloy v. Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 84 S.Ct. 1489]; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1005.) In *Miranda v. Arizona, supra,* 384 U.S. 436, the United States Supreme Court adopted a set of prophylactic measures to protect this right from the "inherently compelling pressures" of custodial interrogation. (*Id.* at p. 467.) To counteract the coercive pressure, the holding of *Miranda* requires police officers to warn a suspect prior to questioning that he has the right to remain silent, and a right to the presence of any attorney. (*Id.* at p. 444.) After the warnings are given, if the suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 101 S.Ct. 1880].)

A suspect may waive the right to remain silent and the right to have an attorney present. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104 [130 S.Ct. 1213, 175 L.Ed.2d 1045].) Once a suspect has waived his *Miranda* rights, any subsequent assertion of the right to counsel must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350].) When a suspect makes an ambiguous or equivocal statement, it is often good police

8

practice for the interviewing officers to clarify whether or not he wants an attorney, but officers are not required to ask clarifying questions. (*Id.* at p. 461.)

Thus, if the accused makes a statement concerning the right to counsel that is ambiguous or equivocal, or makes no statement after admonishment, the police are not required to end the interrogation, or to ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, ___ [130 S.Ct. 2250, 2259, 176 L.Ed.2d 1098].)

The decision in *Berghuis, supra,* notes that there is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously: such a requirement avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity. (*Berghuis v. Thompkins, supra,* 130 S.Ct. at p. 2260.) The court went further to explain that if an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. (*Ibid.*) Thus, after *Miranda* rights have been explained to a suspect, and he or she has waived them, he or she must invoke those rights "affirmatively" to restore the rights after having already waived them. (*Davis v. United States, supra,* 512 U.S. at pp. 460-461.)

The *Davis* requirement for an unambiguous invocation has also been applied to *pre-waiver* statements referring to counsel which are ambiguous or equivocal.[4] (See *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217-219 [during admonishment, defendant said if you bring me a lawyer I can tell you everything I know]; *People v. Farnam* (2002) 28 Cal.4th 107, 181 [preadmonition statement that defendant would not answer questions]; *People v. Johnson* (1993) 6 Cal.4th 1, 25 [preadmonition statement requesting that the interview not be recorded as defendant did not wish to incriminate himself]; *United States v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072, 1078-1079; *United States v. Brown* (10th Cir. 2002) 287 F.3d 965, 972 [defendant answered "yes" to both questions, indicating he would answer questions without a lawyer, and that he wanted to talk to a lawyer].) In *Nelson v. McCarthy* (9th Cir. 1981) 637 F.2d 1291, concluded that ambiguity relating to both pre- and post-waiver assertions of *Miranda* rights required clarification. (*Id.* at pp. 1296-1297.) The clarification rule of *Nelson* survives *Davis.* (*Rodriguez,* at pp. 1080-1081.)

Based on these authorities, and contrary to defendant's argument, "'[t]he rule that interrogation must cease because the suspect requested counsel does not apply if the request is *equivocal*; "[r]ather, the suspect must *unambiguously* request counsel."'" (*People v. Davis* (2009) 46 Cal.4th 539, 587, citing *People v. Sapp* (2003) 31 Cal.4th

---

[4] In his reply brief, defendant asserts that the clarification rule applied only to invocations of the right to counsel made post-waiver, citing *Sessoms v. Runnels* (9th Cir. 2012) formerly at 691 F.3d 1054, 1061-1063. However, the opinion in *Sessoms* was vacated on June 27, 2013, and was remanded to the Ninth Circuit Court of Appeals for reconsideration in light of *Salinas v. Texas* (2013) 570 U.S. ___ [133 S.Ct. 2174, 2013 U.S. LEXIS 4697].

10

240, 266, italics added, quoting *Davis v. United States, supra,* 512 U.S. at p. 459.) Thus, when a suspect makes an ambiguous prewaiver statement, officers are not required to immediately cease questioning.

Whether a suspect has invoked his or her right to counsel is an objective inquiry. (*Davis v. United States, supra,* 512 U.S. at p. 459.) If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, cessation of questioning is not required. (*Ibid.*, italics in original.) If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. (*Id.* at pp. 461-462; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124-1125.)

In *Gonzalez, supra,* the defendant said, "'if for anything you guys are going to charge me I want to talk to a public defendant too, for any little thing.'" (*People v. Gonzalez, supra,* 34 Cal.4th at p. 1116.) The California Supreme Court concluded the statement was conditional, insofar as he expressed desire for a lawyer *if* he was going to be *charged*. (*Id.* at p. 1126.) The court observed that a reasonable police officer in those circumstances would not necessarily have known whether the condition would be fulfilled since the charging decision is not made by police. (*Ibid.*)

In the present case, the defendant's statement was nearly identical to the statement in *Gonzalez* in its conditionality. The officer in this case explained that he wanted to talk to the defendant about his involvement in the incident, and, because defendant had been in custody, he wanted to read the defendant his rights. The defendant stated "Yeah, if

11

this, if this is, if this is like a serious thing though . . . . [¶] . . . I usually don't go through, I don't, I don't talk . . . . If I'm gonna be charged with something or something like that, like, regardless, I'm gonna go ahead and um, I'll just, I'll wait 'til I can talk to my [attorney]." This statement was conditional on two fronts: (a) if this is a serious thing, and (b) if he was going to be charged with something. Insofar as questioning had not begun—nor could it begin until after defendant had been admonished per *Miranda*—the officer could not know if defendant's involvement was serious, or with what, if anything, defendant might be charged. Thus, the officer could either seek to clarify the defendant's ambiguous statement according to good police practice, or proceed with questioning pursuant to the holding of *Davis.* Since the officer had not yet admonished defendant, he proceeded to read the *Miranda* rights to defendant.

An officer's act of giving defendant full *Miranda* warnings and obtaining his waiver of his *Miranda* rights is a legitimate method of clarifying any ambiguity in a defendant's remark. (*People v. Johnson, supra,* 6 Cal.4th at p. 27.) Once a suspect receives *Miranda* warnings, he is free to exercise his own volition in deciding whether or not to make a statement to authorities. (*Oregon v. Elstad* (1985) 470 U.S. 298, 308 [105 S.Ct. 1285, 84 L.Ed.2d 222].) If the suspect thereafter requests counsel, the interrogation must cease until an attorney is present. (*Edwards v. Arizona, supra,* 451 U.S. at p. 482.)

Here, the officer clarified whether the defendant was invoking his *Miranda* rights by reading him the *Miranda* admonishment and asking defendant if he was willing to speak to him. Defendant's agreement to answer questions was a valid waiver of his Fifth Amendment privilege. The statements were properly admitted.

12

## 2.    *Denial of Defendant's Motion for Mistrial.*

Defendant argues that his due process right to a fair trial was violated when the court denied his motion for a mistrial based on prosecutorial misconduct in distributing an unredacted transcript of defendant's taped interview.  We disagree.

### a.    Background

During in limine proceedings relating to the admissibility of defendant's pretrial statements to detectives, the parties agreed that references to defendant's probation and parole status, and his statements about stabbing a couple of people when he was younger would be redacted from the DVD and the transcripts.  The jurors were provided with transcripts of the statement, to read along as they listened to the recorded statements.

As the DVD of the defendant's recorded statement was being played, the prosecutor asked for a sidebar when she realized the transcript that had been distributed had not been redacted.  The prosecutor explained, and the defense acknowledged, that the DVD had been redacted, so the objectionable passages were not heard by the jury.  The defendant requested that the court declare a mistrial, which was denied.  The prosecutor suggested that the transcripts be taken back and replaced with redacted versions.  The court collected the transcripts from the jurors and read an admonishment to the jury that the defense and prosecution had agreed upon.

### b.    Analysis

A motion for mistrial is directed to the sound discretion of the trial court.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 985.)  A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  (*People v.*

13

*Haskett* (1982) 30 Cal.3d 841, 854.) Whether a particular incident is incurably prejudicial is by its nature a speculative matter and the trial court is vested with considerable discretion in ruling on mistrial motions. (*Ibid*.) In reviewing ruling on motions for mistrial, we apply the deferential abuse of discretion standard. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.)

Prosecutorial misconduct may constitute an appropriate basis for a mistrial motion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1154.) A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct that so infects the trial with unfairness as to make the resulting conviction a denial of due process. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Conduct that does not render a trial fundamentally unfair is error under state law only when it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Hamilton* (2009) 45 Cal.4th 863, 920.)

*People v. Hamilton, supra,* involved the retrial of the penalty phase of a capital case in which the prosecution presented transcripts of the testimony of certain witnesses, including the defendant's testimony, from the first trial. One witness from the first trial, whose testimony was not read on retrial, was that of a jail inmate who had testified in the first trial that defendant had confessed to him that he had committed the murder. During cross-examination of defendant in the first trial, the prosecutor asked defendant about the

14

statement of the jailhouse witness relating to the confession, and defendant denied it.  By reading all of the defendant's testimony from the first trial, the jury inferentially learned that a witness from the first trial had testified that defendant had confessed.  (*People v. Hamilton, supra,* 45 Cal.4th at pp. 918-919.)

On review, the Supreme Court held that there was no prosecutorial misconduct in the failure to redact the portion of defendant's prior testimony.  The court noted that the prosecutor did not refer to the alleged confession in arguing to the jury, and concluded any error did not infect the retrial with unfairness or constitute a reprehensible method of persuasion.  (*People v. Hamilton, supra,* 45 Cal.4th at p. 920.).

Here, as well, we find no misconduct.  First, it was the prosecutor who noticed that the transcript had not been properly redacted and who promptly and tactfully brought it to the court's attention without drawing the jury's attention to the harmful material contained in the transcripts.  The defendant did not timely object to the unredacted transcript, and the prosecutor's action prevented any further prejudice to the defendant.  (See *People v. McKinzie* (2012) 54 Cal.4th 1302, 1358.)

Second, the admonition to which the parties agreed was adequate to cure any prejudice where it informed the jurors that they were to consider statements on the DVD as the evidence of defendant's statement, and informed them that the transcripts contained a serious error.  Defendant thus has not shown there was prejudice that could not be cured by an admonition, such as would require a mistrial.  (*People v. Jenkins, supra,* 22 Cal.4th at pp. 985-986.)  The brief and inadvertent exposure of the jury to the unredacted transcript did not render the defendant's trial unfair where it did not infect the

trial with unfairness or constitute a reprehensible method of persuasion. (*People v. Hamilton, supra,* 45 Cal.4th at p. 920.) The trial court did not abuse its discretion.

**3.      *The Abstract of Judgment Must be Amended*.**

In reviewing the record, we have noted a clerical error in the abstract of judgment. Line 6(d) of the abstract of judgment correctly reflects that defendant was sentenced to 30 years to life in state prison, but line 8 fails to indicate that the sentence was imposed under the Strikes law. The abstract must be amended.

The abstract of judgment constitutes the commitment and is the order sending the defendant to prison, and the process and authority for carrying the judgment and sentence into effect; no other warrant or authority is necessary to justify or require its execution. (Pen. Code, § 1213; *People v. Mitchell* (2001) 26 Cal.4th 181, 185, citing *In re Black* (1967) 66 Cal.2d 881, 890.) It goes without saying that accuracy is essential in a document that prescribes the execution of sentence and is provided to criminal investigation and identification. (Pen. Code, § 1213, subd. (a).)

This court has the authority to correct clerical errors at any time. (*People v. Mitchell, supra*, 26 Cal.4th at pp. 186-187.) The clerk is directed to amend the abstract of judgment to reflect that the sentence was imposed under the Strikes law by checking the box on line 8.

### DISPOSITION

The clerk of the superior court is directed to amend the abstract of judgment by checking the box on line 8 to reflect that the sentence was imposed under the Strikes law,

16

and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

KING
J.

CODRINGTON
J.

17