Filed 3/28/13  P. v. Alford CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036961 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F17852) |
| v. | |
| DAVID PATRICK ALFORD, | |
| Defendant and Appellant. | |

A jury convicted defendant David Patrick Alford of the second degree murder of Hans Hugo Heath and found that he used a gun to commit the crime.  (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (b).)  Defendant shot Heath from the back seat of his car while Heath was sitting in the front passenger's seat.  On appeal, defendant claims that he invoked his right to counsel during his interrogation by two law enforcement detectives and the trial court violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) by allowing the jury to hear the detectives' questioning of him after he did so.

We conclude that the trial court erred when it ruled that the recording was admissible, but defendant was not prejudiced by this error.  Accordingly, we will affirm the judgment.

FACTS AND PROCEDURAL BACKGROUND

There is little dispute about the events leading to defendant's murder conviction. All agree that defendant fatally shot Hans Hugo Heath in the head as Heath sat in the

front passenger seat of defendant's Lexus sport-utility vehicle and that defendant disposed of Heath's body by casting it over the side of a coastal highway. The only dispute at trial concerned defendant's mental state when he killed the victim.

Almost all of the evidence regarding the few disputed facts came from defendant's testimony. There were no witnesses to the killing other than perhaps defendant's 24-year-old daughter, Laura Alford (Laura). Because the state charged her with being an accessory (Pen. Code, § 32) to the murder of Heath—although the parties inform us that the jury acquitted her—she was not required to testify and did not do so.

The prosecution's favored theory, advanced through cross-examination and at closing argument, was that defendant killed Heath in anger, and with sufficient premeditation and deliberation to constitute a first degree murder (Pen Code, § 189), due to the victim's belligerence, uncouth behavior, and vulgarity.

Defendant testified that on April 20, 2009, he met Heath at a liquor store near defendant's home in Santa Cruz. Heath, considerably intoxicated, was loitering there, and defendant, evidently out of courtesy or a desire to converse, invited him over to his house.

Laura was at the house when her father showed up with his guest. Heath tried to put his arms around Laura and dance with her. Laura pushed him away. Heath also made licentious remarks about Laura's physical attributes. Defendant told Heath to stop. Heath commented that he had just been released from the California State Prison at San Quentin, could slit the throats of defendant and his wife at any time and kill their children, and would be indifferent to doing it.

As tensions arose, Heath "started kicking at me" and "throwing punches," defendant testified. The record suggests generally that defendant had an obsession with tidiness, and defendant not only had to deal with Heath's physical aggression but was irritated that Heath was lying on his couch without removing his boots and hat. He

2

decided that Heath should leave.  Defendant, Heath, and Laura went to the Lexus and got in.  Laura drove; Heath was in the front passenger seat and defendant sat behind him.

Heath continued to make belligerent remarks and soon he "started grabbing at Laura's arms and at the steering wheel."  As the vehicle swerved, defendant tried to grab Heath, flailed at him, and yelled at him to get his hands off Laura.  At the same time Heath was grappling with Laura, he flailed back at defendant, trying to grab his arms and hair.  Defendant was afraid for the safety of Laura; he feared that Heath was about to cause a serious automobile accident.  "I was extremely concerned we were going to have an accident with the vehicle," he testified, "and that we would be seriously injured . . . ."  He was also trying to get Heath to "stop attacking my daughter."  It was "a matter of self defense" and "of protecting my daughter," he explained on cross-examination.

Then defendant killed Heath, using a handgun that was in a camera case at his feet in the rear seat.  On direct examination, he testified as follows:

"Q.  Why did you grab the pistol?

"A.  Because I wanted to hit him in the head with it to inflict enough pain so he would stop grabbing at my daughter and the steering wheel and I could sit him up in the front seat and regain control of the vehicle.

"Q.  Which hand did you have the pistol in?

"A.  My right hand.

"Q.  How were you holding it?

"A.  By the handle.

"Q.  What did you attempt to do with it?

"A.  I tried to hit him in the head with it to inflict enough pain that he would stop attacking my daughter.

"[¶]  . . .  [¶]

"Q.  Were you doing anything with your left hand at that point?

3

"A. . . . I was pulling his . . . head . . . to sit him up[,] pulling his head in the opposite direction.

"Q. So what did you actually do with the gun?

"A. Well, I came down to hit him in the head. I believe that I grazed his head. And then there was a flash and a bang and I realized that the gun had discharged.

"Q. Were you expecting that to happen?

"A. No, by no means was I expecting it to happen.

"Q. Did you intend to have the gun discharge?

"A. No, sir.

"[¶] . . . [¶]

"Q. After the gun went off, what happened to Mr. Heath?

"A. Unfortunately, Mr. Heath went completely limp. And I was able to sit him up in the seat in an upright position.

"[¶] . . . [¶]

"Q. Could you tell at that time what had happened to him?

"A. Unfortunately, yes.

"Q. What could you determine?

"A. I determined that the round went through the back of his neck and out the . . . left side of his skull.

"Q. What was going through your mind at that point?

"A. Panic. Total panic. I did not—could not believe what had transpired."

Later, defendant and his counsel had this exchange before the jury:

"Q. Did you want to kill Mr. Heath?

"A. No, by no means.

"Q. Did you intend to kill him?

"A. No, sir.

"Q. Did you intend for the gun to go off?

4

"A.  No, sir.

"[¶] . . . [¶]

"Q.  What were you trying to do when you took the gun out?

"A.  Trying to stop him from attacking my daughter."

Cross-examination of defendant elicited a detailed second-by-second description of the moments before he killed Heath:

"Q. . . . [W]hat part of the gun were you holding?

"A.  I was holding the handle, the—where the clip goes inside.

"Q.  The grip?

"A. The grip.

"Q.  So you just had your hand around it, the grip?

"A.  That's correct.

"Q.  And then you started hitting him in the head?

"A.  That is correct.

"[¶] . . . [¶]

"A. . . . I'm hitting with the butt of the gun with the bottom of the clip.

"[¶] . . . [¶]

"Q.  Sort of overhead and the gun's coming out the bottom of your hand and you're hitting him with it?

"A.  That's correct.

"[¶] . . . [¶]

"Q.  Now, you heard the testimony that Mr. Heath was shot on the right side of his neck; right?

"A.  Correct.

"Q.  How's the gun hit[ting] him there if you're hitting him only with the butt?

"A.  It may have slid down.  Apparently it had slid down past the top of his head down toward his neck.

"Q.  Apparently?

"A.  Apparently so.  I mean, that's quite obvious.  There's a hole there.

"[¶]  . . .  [¶]

"Q.  And it's your testimony that somehow when you were hitting him in the head, holding just the grip, that the gun somehow accidently fired and shot him in the back of the neck and passed through his skull?

"A.  That is correct.  And my hand was on the other side of his head.

"[¶]  . . .  [¶]

"Q.  You're holding his head—

"A.  Trying to pull him off Laura, yes.

"Q.  Now, when you picked up the gun, did you stick your finger in the trigger guard?

"A.  More than likely.

"Q.  You don't remember?

"A.  Not specifically, no, but that's how typically you hang on to the gun the best.

"[¶]  . . .  [¶]

"Q.  To use as a bludgeon to hit somebody with?  You think you hold on to it with your finger in the trigger guard?

"A.  Yes, ma'am.

"Q.  Were you trying to shoot him?

"A.  No, ma'am.

"Q.  Then why did you put your finger in the trigger guard if in fact you did?

"A.  Because that's how you typically can hang on to the handle without it flying out of your hand the best.

"Q.  So you don't think you could have just held the handle without putting your finger in the guard and hit him with the butt?

"A.  I believe the gun probably would have went flying out of my hand.

6

"Q. Why do you think that?

"A. Because of just the way you hold the grip on the gun.

"[¶] . . . [¶]

"Q. Now, you testified that you hadn't had any experience with guns?

"A. That's correct.

"Q. Why did you testify earlier . . . that that's where you hold a gun is by putting your finger in the trigger guard?

"A. Well, that's what I've seen from the past 40 years as far as someone holding a gun and shooting it."

Also on cross-examination, defendant testified that he told Heath he could kill him just as Heath was threatening to kill everyone in defendant's family. But defendant considered Heath's threats to be the ramblings of a drunk person and not conveying a serious menace. As cross-examination continued, defendant could not explain why he failed to register the gun despite knowing that it had to be registered. Defendant also testified that he had Laura drive home. He dropped her off and drove away with Heath's body in the vehicle. He deposited the body at an isolated spot along the coast.

Defendant acquired the gun in the early 1990s. A neighbor in Oregon, where he used to live, gave it to him. He would carry it on construction industry business trips in which he carried large amounts of cash. The last time he serviced it, about a decade before the killing, he was unaware that it was loaded. He saw at that time that the clip held a bullet but did not believe that there was a round in the chamber and did not check to see if there was one.

The authorities were not long in identifying defendant as the suspect in Heath's killing. They found the phone number of one Robert Ledesma in a pocket of Heath's clothing. Before they could locate Ledesma he contacted them, having heard about the killing of Heath, and he told them that Heath had called him on the night of April 20, 2009, i.e., the night that Heath was at defendant's house. Heath, who was drunk, said that

he was at the house of people who had lived in Oregon, as defendant had and Laura still did.  The authorities traced Heath's call back to the telephone of Laura.  After arresting defendant and Laura, they examined defendant's vehicles and found blood throughout the front part of the Lexus, although its interior had been cleaned.  Deoxyribonucleic acid analysis showed some of the blood to be Heath's and some defendant's.  They also found gunshot residue in the front part of the vehicle.

The authorities took defendant to a station for questioning on suspicion that he had killed the victim.  Two detectives, one from Santa Cruz County and one from Monterey County, questioned defendant.  As noted, the interrogation was recorded.

Before trial, the prosecution moved to admit defendant's statements during that interrogation.  Defendant moved to exclude them.  As we will describe further below, the trial court denied defendant's motion and, as part of its case-in-chief, the prosecution played a video recording and an audio recording of defendant's statements to the jury.

During the interview, one of the detectives read defendant his *Miranda* rights, and defendant indicated he understood them.  He asked if he was under arrest and was told that he was not.

After acknowledging his understanding of his *Miranda* rights, defendant described making dinner and drinks for himself and Laura.  When asked if anyone else was present, defendant first said no, and then stated, "I think at this point I would like an attorney.  Cause I don't know how to answer the questions correctly."  One of the detectives asked, "Are you saying you don't want to talk to me anymore and you'd rather have an attorney here?"  Defendant replied, "Well, I don't, I don't know, there was an individual that happened to stop by and he was there for about an hour and we told him to get the heck out of there . . . this guy was crazy.  And I don't know where we're going with that.  And so I'm, I'm, concerned."

8

The detective asked, "what are you saying? You don't want to . . . talk to us anymore without an attorney?" Defendant replied, "I don't know . . . the correct thing to do here[,] guys." The detective said, "the truth is always the right thing to do."

Defendant said that if he continued to speak with the detectives "I don't think that will allow me to walk out [of] here tonight." "I'm concerned of how . . . I present it so that . . . the situation doesn't end up . . . unfolding correctly [*sic*]. . . . I really don't know what to do here[,] guys." Again the detective recommended that defendant confess, saying that "being truthful is the way to go." Defendant said, "I have every intention of doing that. But I want to make sure that I do that[ ] correctly[;] that's my only concern."

Continuing to debate with himself about the right course of action, defendant said, "maybe I've watched too much T.V. . . . I don't know what the correct thing to do here[ ] is[;] I know what transpired and had to happen. Okay?"

The detectives waited for defendant to speak further, and he volunteered, "it's not a good situation. A waste." Then he resumed debating what to say: "I'm really trying to choose my words correctly[,] guys. Um, suffer the consequences because [of] someone else's ignorance, ignorant actions, well, I don't know how else to say it. And I just want to make sure that I do it right."

A detective said that they were willing to hear defendant's explanation, but defendant replied, "that's still going to put me in the slammer for X amount of time . . . ." Without further ado, defendant said, "we were attacked and I had to do something about it." He then reverted to wondering what to say: "I don't know what else to do here other than to say, okay, do I, do I talk to an attorney . . . I don't know what to do[,] guys."

One of the detectives asked, "who attacked you?" and defendant said someone "so intoxicated and so belligerent that I couldn't understand him." After defendant had the man come over to his house, he started acting peculiarly. Defendant offered to take him to the nearby town of Soquel. Defendant said Laura was driving and he had to do something to stop Heath. Defendant continued to provide information about the man,

9

including his bizarre and sometimes vulgar behavior, and other details about the evening, none of it directly inculpating him or Laura—rather, defendant was "trying to diffuse [*sic*: defuse] the situation." He then said, "we finally convinced him, okay, hey look, get in the car, let's take you up to Soquel, you can go do whatever you want to do. . . . And . . . that's all I . . . want to say without talking to some legal counsel . . . ." The interview ended after the detectives made further efforts to persuade defendant to provide additional information and he declined to do so.

Based on the evidence, the trial court instructed the jury on a number of options.

With regard to the substantive law of unlawful homicide, the court instructed the jury that it could convict defendant of first or second degree murder or voluntary or involuntary manslaughter. With regard to murder, the court explained the concepts of express and implied malice. With regard to manslaughter, the court explained the concepts of provocation and imperfect self-defense. The court also told the jury that it could acquit defendant on the basis that the homicide was justifiable or excusable and therefore lawful. The basis for a justifiable homicide could be defendant's lawful defense of himself or Laura. Mere accident, the jury learned, constituted excusable homicide.

As for the gun-use sentence enhancement statute (§ 12022.53), the trial court also instructed the jury on a number of options. In terms of increasing seriousness, the jury was informed that it could find that defendant merely used a firearm, that he intentionally fired a firearm, or that he intentionally fired a firearm and injured or killed someone as a result. The jury chose the least serious of these three options.

DISCUSSION

Defendant claims that the trial court violated his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution by allowing the prosecution to play to the jury his recorded statements to the detectives who were interviewing him. He claims that this was done in violation of *Miranda*, *supra*, 384 U.S. 436.

10

## I.     *Pretrial Motions*

At a hearing on the pretrial motions, the trial court stated that it had reviewed the videotaped interview and read the transcript.  Viewing the video recording was "instructive because not only do you hear audio, but you have an opportunity to at the same time see the parties as they're speaking . . . ."  "[T]he advantage of the videotape is that you get to see the body language, you get to see the inflections, you get to see the facial expressions of the people," including defendant's "relaxed nature throughout the entire interview."

The trial court ruled, first tentatively and then definitively, that defendant "did not make an unequivocal and unambiguous request for an attorney" at the first mention of an attorney when he said, "I think at this point I would like an attorney.  Cause I don't know how to answer the questions correctly."  He did so only when he said, "that's all I . . . want to say without talking to some legal counsel . . . ."  The court indicated that it was considering "the totality of the entire record" of the interrogation in ruling against defendant.

## II.     *Standard of Review and Underlying Legal Principles*

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained.  [Citation.]  Because what defendant here said during his interview with the detectives is undisputed, we engage in a de novo review of the legal question of whether the statement at issue was ambiguous or equivocal."  (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)  Even under independent review, we "may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence."  (*People v. Jennings* (1988) 46 Cal.3d 963, 979.)

11

Under *Miranda*, "assertion of the right to counsel [is] a significant event and . . . once exercised by the accused, 'the interrogation must cease until an attorney is present.'" (*Edwards v. Arizona* (1981) 451 U.S. 477, 485.)

Once a suspect has waived his or her *Miranda* rights, however, any further requests for counsel must be made affirmatively and unequivocally. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 461 (*Davis*).) "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' . . . , the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." (*Berghuis v. Thompkins* (2010) 560 U.S. __ [130 S.Ct. 2250, 2259-2260, 176 L.Ed.2d 1098].)

The rationale for this rule is readily understood: "One of the *Miranda* Court's primary concerns was the temptation for law enforcement, operating with little or no supervision of their investigative actions, to overbear a defendant in an isolated interrogation setting" (*Sessoms v. Runnels* (9th Cir. 2012) 691 F.3d 1054, 1059), but "full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." (*Berghuis*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2260].) Moreover, the suspect's right to be free from coercion must be balanced against the government's interest in investigating crime, and "when the officers conducting the questioning reasonably do not know whether the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.'" (*Davis*, *supra*, 512 U.S. at p. 460.) "A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning

12

must cease—it is one that must be affirmatively invoked by the suspect." (*Id*. at pp. 460-461.)

In summary, "We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." (*Davis*, *supra*, 512 U.S. at p. 462.)

" '[T]he exclusion of . . . statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation." (*United States v. Patane* (2004) 542 U.S. 630, 641-642 (plur. opn.); see *People v. Nelson* (2012) 53 Cal.4th 367, 371; *People v. Thornton* (2007) 41 Cal.4th 391, 432.)[1]

III.  *Allowing the Jury to Hear the Continued Questioning of Defendant Violated* Miranda

On review, whether a statement is equivocal or unequivocal is examined according to whether "a reasonable [police] officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." (*Davis*, *supra*, 512 U.S. at p. 459.) If so, "our precedents do not require the cessation of questioning."

---

[1] It is a subject of dispute in the United States Supreme Court whether a *Miranda–Edwards* violation occurs on the admission of evidence at trial or when the authorities are questioning a suspect. (Compare *Patane*, *supra*, at p. 641 (plur. opn.) with *id*. at p. 645 (opn. of Kennedy and O'Connor, JJ., conc. in judg.).) It suffices to conclude here that a *Miranda–Edwards* violation was complete when the trial court admitted the evidence, whether or not it occurred when the detectives continued to question defendant. Throughout this opinion we will speak of a *Miranda–Edwards* violation by the court below, though we recognize that the question of when a violation occurs is still in dispute.

(*Ibid.*)  The suspect's comments on the subject are to be "understood as ordinary people would understand them."  (*Connecticut v. Barrett* (1987) 479 U.S. 523, 529.)

We have read the transcript and watched the video recording of defendant's statements to the two detectives.  The recording shows continual hesitation and other body language indicating that defendant was wrestling with conflicting impulses.  The first was to answer the questions or at least try to formulate answers that would be as minimally inculpatory as possible.  The second was to say nothing and disappoint his questioners—although they were polite, low-key, and not coercive.  In a nutshell, defendant hemmed and hawed repeatedly over whether to tell his interrogators what happened, providing some information as he openly debated with himself about the best course of action, and finally deciding to say no more.

Defendant, aware of the legal principles set forth above, argues that ordinary people and certainly a reasonable law enforcement detective would understand him to have been asking unreservedly for counsel the first time the subject arose.  He argues, "In ordinary, everyday English as it is used in this country, what appellant politely said to the detectives was that he wanted an attorney's help.  [¶]  . . .  When appellant said, 'I think at this point I would like an attorney, Cause I don't know how to answer the questions correctly,' there was no '*probably* would be a *good idea*' equivocation as in *Bacon* [*People v. Bacon*, *supra*, 50 Cal.4th at p. 1104], there was no '*Maybe* I *should* talk to a lawyer' equivocation as in *Davis* [*Davis*, *supra*, 512 U.S. at p. 455], and there was no 'I think it's *about* time for me to stop talking' equivocation as in . . . *People v. Stitely* (2005) 35 Cal.4th 514, 534.  When appellant's statement is analyzed standing alone, there was just one way for the detectives to reasonably construe it: at that point in the interview, appellant wanted an attorney's assistance.  . . .  [P]roof that this was a reasonable construction of what appellant said can be found in the very next question asked . . . :  'Are you saying you don't want to talk to me anymore and you'd rather have an attorney

14

here.' [Citation to the record.] This question shows that the detective in the interview room understood exactly what appellant's statement meant."

We agree with the foregoing interpretation of defendant's statement. Defendant's request for counsel did not contain the ambiguities present in other cases he contrasts with his own.

*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203 provides a recent example of a comment about counsel found to be ambiguous. In that case, the suspect said, "If you can bring me a lawyer, that way I[,] I with who . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me." (*Id*. at p. 216.) This garbled narrative, which also faced the additional opportunity for confusion that the suspect was speaking Spanish and his words were interpreted into English by a police officer (*id*. at pp. 210, 215), caused our Supreme Court to conclude that, among other problems, including mentioning a desire for counsel in a conditional manner, the suspect's statement regarding counsel "was equivocal in that defendant went on to plainly state his intent and desire to waive his right to remain silent and 'tell you everything that I know and everything that I need to tell you,' but then ended his response ambiguously with the words 'and someone to represent me.' From an objective standpoint, a reasonable officer under the circumstances would not have understood defendant's response to be a clear and unequivocal request for counsel." (*Id*. at p. 219.) Conversely, as we have explained, the statement of defendant here was a politely phrased request to have a lawyer summoned to help him answer questions.

When the detective asked, "Are you saying you don't want to talk to me anymore and you'd rather have an attorney here?" defendant answered, "Well I don't, I don't know" and then dropped the matter to explain that he and Laura had had to deal with a "crazy" individual. So within moments of his request for counsel, defendant became unsure whether he wanted counsel or not.

15

Contrary to what the trial court thought and what the People argue on appeal, however, we cannot look to defendant's "I don't know" statement or the rest of the interrogation to determine his initial level of equivocation. *Smith v. Illinois* (1984) 469 U.S. 91 (*per curiam*) rejected this approach. "The courts below were able to construe Smith's request for counsel as 'ambiguous' only by looking to Smith's subsequent responses to continued police questioning and by concluding that, 'considered in total,' Smith's 'statements' were equivocal. [Citations.] This line of analysis is unprecedented and untenable. . . . '[A] statement either is such an assertion [of the right to counsel] or it is not.' [Citation.] Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." (*Id*. at pp. 97-98, fn. omitted; see *People v. Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 221, emphasis added ["Under the totality of the circumstances, we conclude defendant's *waiver* of his *Miranda* rights, including his right to counsel, was voluntary, knowing and intelligent."].)[2]

On the question of ambiguity and equivocation, *Smith v. Illinois*, *supra*, 469 U.S. 91, could not have been clearer about the required procedure: "We hold . . . that . . . an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." (*Id*. at p. 100.) Unlike the test courts may apply in determining whether a suspect waived his *Miranda* rights, no

---

[2] In addition, as we explain *post*, pages 18-19, waiver could not be conditioned on continued pressure by the detectives after defendant stated that he wanted counsel.

totality of the circumstances test applies if a suspect's initial expression of a desire for counsel is unequivocal.[3]

We are thus required, on independent review of the trial court's determination and notwithstanding that we may accord weight to a trial court's determination under this standard of review, to find differently from the court below and conclude that it violated defendant's *Miranda* rights. There are times in which the law creates bright-line rules that we must follow. One such rule is that, as stated, "if the suspect invokes the right to counsel at any time, the police must *immediately* cease questioning him until an attorney is present." (*Davis*, *supra*, 512 U.S. at p. 462, italics added.) Immediately means just that—without attempts, however naturally human, to ask the suspect further what he or she means.

Such bright-line rules—as we describe below, the United States Supreme Court uses this adjective in discussing this precise issue—may seem to elevate form over substance, but there are sometimes reasons for doing just that, and in this case the reason

---

[3] In *People v. Crittenden* (1994) 9 Cal.4th 83, the court commented on the state of "the entire record," including events following an initial question the suspect asked about counsel, but only after determining that the initial utterance was equivocal. (*Id*. at p. 130; see also *People v. Bacon*, *supra*, 50 Cal.4th at pp. 1105-1107 [accepting the defendant's invitation to review all of the circumstances of the interrogation] & *id*. at p. 1107 [considering "the totality of this exchange" to "conclude that defendant's reference to an attorney was equivocal or ambiguous"].)

Mindful of our obligation to follow the holdings of our Supreme Court (*Auto Equity Sales, Inc*. *v. Superior Court* (1962) 57 Cal.2d 450, 455), we would note that the statement in *Crittenden* was a dictum that followed the court's conclusion that the defendant's initial utterance regarding counsel was ambiguous—"defendant did not unequivocally state that he wanted an attorney, but simply asked a question." (*Crittenden*, *supra*, 9 Cal.4th at p. 130; see *id*. at pp. 123, 124).) In these circumstances, *Auto Equity* is not binding. (*Renz v. 33rd Dist. Agricultural Assn*. (1995) 39 Cal.App.4th 61, 67-68.) In *People v. Bacon*, *supra*, 50 Cal.4th 1082, the defendant invited the court to consider all of the circumstances of his interrogation, so the issue we address here was not squarely before the court for its consideration.

17

is to provide clarity to law enforcement interrogators regarding how they are to proceed. "[O]nce 'an accused has invoked his right to have counsel present during custodial interrogation . . . [he] is not subject to further interrogation by the authorities until counsel has been made available,' unless he initiates the contact." (*Montejo v. Louisiana* (2009) 556 U.S. 778, 787, quoting *Edwards v. Arizona*, *supra*, 451 U.S. at pp. 484-485.) If a suspect has fallen short of invoking his right to counsel and made only "a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, [citation], or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." (*Berghuis v. Thompkins*, *supra*, 560 U.S. at p. __ [130 S.Ct. at pp. 2259-2260].) But if the answer is unambiguous, as defendant's answer here was, "The *Edwards* rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " (*Montejo*, *supra*, 556 U.S. at p. 787.) "[T]his court has praised *Edwards* precisely because it provides ' "clear and unequivocal" guidelines to the law enforcement profession,' [citation]. Our cases make clear which sorts of statements trigger its protections, [*Davis*, *supra*, 512 U.S. at p. 459], and once triggered, the rule operates as a bright line." (*Id*. at pp. 796-797.) *Davis* said, in turn, "The *Edwards* rule—questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." (*Davis*, *supra*, at p. 461.)

IV.     *Prejudice*

When we conclude that a *Miranda–Edwards* violation has occurred, we review it for prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Davis* (2009) 46 Cal.4th 539, 598.)

This is, as defendant observes, an exacting standard.  "The State bears the burden of proving that an error passes muster under [the *Chapman*] standard" of prejudice. (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 630.)  Under *Chapman*, it is not enough to determine that " 'in a trial that occurred without the error, a guilty verdict would surely have been rendered . . . .' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)  Rather, the state must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman v. California*, *supra*, 386 U.S. at p. 24). " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]  Thus, the focus is what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

Reviewing for prejudice under the foregoing standards, we find the admission of the interrogation not to have prejudiced defendant.  The jury rejected a prosecution charge that defendant committed first degree murder and convicted him of second degree murder.  The portion of the interrogation following the detectives' disregard for defendant's first request for counsel offered only a vague and amorphous tableau in which defendant and the drunk, addled, aggressive, and vulgar Heath had a confrontation, one sufficiently serious for defendant to be worried about penal consequences.  At the same time, defendant characterized his role as one of "trying to diffuse [*sic*: defuse] the situation."  In sum, given all the evidence that defendant killed Heath in defendant's car, including defendant's own testimony at trial about the killing, the interrogation recording

19

yielded nothing particularly inculpatory beyond a hazy description of what might be some form of unlawful homicide, but not one that would necessarily constitute murder. As we explain below, it could have been voluntary or involuntary manslaughter.

Indeed, it was defendant's own testimony that established that he committed the second degree murder of Heath. The jury was instructed on two theories of second degree murder, a crime that requires a finding of malice aforethought. It was directed to consider express malice and implied malice. It was not required to decide unanimously the type of malice aforethought that formed the basis for each juror's second degree murder finding. (*People v. Brown* (1995) 35 Cal.App.4th 708, 710, 713-715.) We do not know the basis for the verdict, but either express or implied malice suffices to validate it.

Express malice is defined as killing with the intent to kill. Malice is implied when the evidence of intent to kill is lacking but there is evidence that the actor committed an extremely dangerous act while remaining indifferent to the lethal consequences, i.e., "when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152.) Gripping a loaded gun with one's finger on the trigger and holding it against the head of someone while gripping the other side of the victim's head with one's other hand is ample evidence of murder committed with implied malice. There was substantial evidence that defendant acted with malice aforethought, either express or implied but necessarily one or the other.

To be sure, defendant's testimony persuaded the trial court to instruct on the defenses of imperfect and perfect self-defense. The former is a "judicially developed theory" (*People v. Rios* (2000) 23 Cal.4th 450, 465) that negates malice aforethought when the killer harbors "an actual but unreasonable belief in the need to defend oneself or others from imminent peril to life or great bodily injury." (*In re Lucero* (2011) 200 Cal.App.4th 38, 42, fn. 3.) The latter—when such action is based on an objectively

20

reasonable belief—is a complete defense to crime. (*People v. Battle* (2011) 198 Cal.App.4th 50, 72.) As for involuntary manslaughter, performing "an act with criminal negligence supplies the criminal intent for involuntary manslaughter . . . ." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1008) even if the act is lawful (*ibid.*). The jury was instructed on these possibilities and rejected them, despite the fact that the part of the interrogation that followed defendant's first *Miranda–Edwards* request for counsel suggested the commission of either a manslaughter or no criminal offense. In other words, admission of the portion of the interrogation which defendant sought to have suppressed benefited him by providing the jury with a reason to find that he committed the lesser offense of manslaughter, if any criminal offense at all. But to repeat, it was defendant's own testimony at trial that pointed inescapably toward express or implied malice murder, which is what the jury found. Therefore, the jury's verdict was unattributable to the playing of the recording of defendant's interrogation by the detectives.[4]

_____

[4] At oral argument and in his reply brief, defendant argued that the prosecutor was able to invoke discrepancies between his statements to detectives and his testimony before the jury to make him out as a liar. The gravamen of the prosecutor's argument, however, was that "in the intervening almost two year period, he's had time to think up his story. . . . And he's had a lot of time to think of the details of that story and what facts would potentially constitute a defense to murder."

As we have explained, defendant's statements to the detectives was not particularly inculpatory beyond suggesting that he committed some form of unlawful homicide, not necessarily murder, whereas his testimony established that he committed second degree murder. The prosecutor's statement during argument that defendant "did not tell [the detectives] one thing," "[n]ot even a little thing that would constitute a defense to the charge of murder," was inaccurate, and we must presume that the jury paid attention to the evidence and discounted this inaccurate argument. Moreover, the prosecutor conceded later on during closing argument that "[m]ost of what he told the detectives, almost all of what he, frankly, told the detectives related to what happened at the house," as opposed to in the car afterward. "And it was consistent for the most part with his testimony in court." The prosecutor's closing argument does not detract from

*(continued)*

21

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Mihara, J.

---

our conclusion that the trial court's erroneous ruling was harmless under *Chapman v. California*, *supra*, 386 U.S. 18.